Argued March 22, reversed May 28, 1929.

KELP ORE REMEDIES CORPORATION *v.* H. H. BROOTEN ET Ux.

(277 Pac. 716.)

For appellant there was a brief and oral argument by *Mr. John W. Kaste.*

For respondent there was a brief over the name of *Messrs. Veazie & Veazie,* with an oral argument by *Mr. J. C. Veazie.*

ROSSMAN, J.—In its complaint the plaintiff claims damages for breach of an alleged contract; a copy of it follows:

"THIS MEMORANDUM OF AGREEMENT made and entered into this 21st day of February, 1925,

by and between H. H. Brooten and Isabelle Brooten, husband and wife, of Cloverdale, Oregon, parties of the first part, and P. A. Tucker and L. I. Sullivan, of Portland, Oregon, parties of the second part.

"WITNESSETH:

"THAT WHEREAS, the parties of the first part are the owners in fee simple of the following described real property located and situated in Tillamook County, Oregon, to-wit: * * which property contains certain medicinal ore known as Brooten Kelp Ore.

"AND WHEREAS, the parties of the first part desire to give the exclusive right of selling and distributing said Brooten's Kelp ore and to create an extensive agency therefor covering the United States of America.

"NOW THEREFORE IT IS HEREBY MUTUALLY PROMISED AND AGREED by and between the parties hereto and in consideration of $1.00 and other valuable considerations paid to the parties of the first part by the parties of the second part, the receipt whereof is hereby acknowledged, the parties of the first part hereby promise and agree to give to the parties of the second part the exclusive right and agency throughout the United States to sell and distribute said Brooten Kelp Ore from the property heretofore described upon the terms and conditions hereinafter provided.

"The parties of the second part are to pay to the parties of the first part one dollar per pound for said Brooten Kelp ore and three dollars per gallon for Brooten Kelp liquid ore to contain specific gravity test of not less than thirty. The party of the first part is to furnish one fifty cent (50¢) carton of Kelp ore with each pound of Kelp ore.

"That said parties of the first part are to prepare said liquid Brooten Kelp ore and deliver the same upon the premises hereinbefore described and to furnish to the parties of the second part any amount of said liquid and mineral ore as they may require.

"IT IS FURTHER AGREED AND UNDER-STOOD that the parties of the second part shall purchase from the parties of the first part not less than Five Thousand ($5000.00) dollars of said products on May 2nd, 1925, One Thousand ($1000.00) dollars of which is herewith paid upon said amount of Five Thousand ($5000.00) dollars for products to be hereafter delivered and said One Thousand ($1000.00) dollars to be paid upon the terms and conditions hereinafter provided and stipulated, and for a period of nine months following said second day of May, 1925, said parties of the second part are to purchase not less than Five Hundred ($500.00) dollars per month being the total sum of Nine Thousand Five Hundred ($9500.00) dollars of products to be purchased by the parties of the second part nine months after May the 2nd, 1925, all purchases to be paid for in cash before said purchases leave the premises and the parties of the second part for the second year of this contract agree to purchase a greater amount of said products than the first year and each succeeding year thereafter to purchase a greater amount than the preceding year it being intentioned that each succeeding year must show an increase in quantity purchased over the preceding year or this contract shall become null and void.

"IT IS FURTHER AGREED AND UNDER-STOOD that the parties of the first part at their own expense place said ore in pound boxes and crate the same, that for all liquid ore prepared the containers therefor shall be paid for by the parties of the second part.

"IT IS FURTHER AGREED AND UNDER-STOOD that the parties of the first part shall have the right to sell to individual consumers said Brooten Kelp ore in pound packages not to exceed the sum of $200.00 per month at the rate of $2.50 per pound and any amount sold over and above the same shall belong to the parties of the first part and second part jointly.

"IT IS FURTHER AGREED AND UNDER-STOOD that the parties of the first part shall have

the exclusive right to continue to maintain, operate and conduct their baths upon said premises. The parties of the second part have no right to give Kelp ore baths.

"IT IS FURTHER AGREED AND UNDERSTOOD that this contract shall be considered as a lease upon all the Kelp ore upon the premises hereinbefore described and to run with the land and to be a part of said real property and that the parties of the first part shall not encumber said premises so as to interfere with the right of the parties of the second part in selling and distributing of said ore and that in the event of any liens or encumbrances are upon said premises and not paid for by the parties of the first part the parties of the second part may pay the same and deduct the amount paid thereon from the purchase price of the ore purchased from the parties of the first part.

"IT IS FURTHER AGREED AND UNDERSTOOD that this contract and agreement shall continue so long as any of said ore remains upon said premises and so long as the parties of the second part fulfill and carry out the terms and conditions of this agreement.

"IT IS FURTHER UNDERSTOOD AND AGREED that the parties of the second part are to form a corporation and this lease and agreement is to be assigned to said corporation subject to all the terms and conditions herein contained, and

"IT IS FURTHER AGREED AND UNDERSTOOD that all the terms and conditions of this contract and lease shall be binding upon the heirs, successors and assigns of the parties hereto and said corporation to be organized.

"PROVIDED HOWEVER, that this contract shall not go into effect unless there is a cancellation of that certain contract made and entered into on the 29th day of January, 1925, wherein the parties of the first part are the parties of the first part in said contract and G. B. Campbell, P. A. Tucker and L. I.

Sullivan are parties of the second part, which contract is acknowledged on the 9th day of February, 1925, and purports to give to the said parties of the second part in said contract the exclusive selling agency of said Kelp ore products and covering the identical premises herein described and which contract is now in existence and in full force and effect. That in the event said contract is fulfilled and carried out by said second parties then the said One Thousand ($1000.00) dollars paid herein by the parties of the second part to the parties of the first part shall be refunded to the parties of the second part, it being the intention of the parties herein that only in case that the aforesaid contract is not carried out and fulfilled and cancelled by the parties of the second part or the parties of the first part then this contract shall be considered as going into effect upon the second day of May, 1925, upon the payments being made as herein contained.''

The document was signed and sealed.

January 13, 1926, the parties indorsed upon that instrument and properly executed the following: ''We hereby extend this contract for a period of one year from this date of January 13, 1926.''

March 12, 1926, the parties signed a further instrument which provided (omitting formal parts):

''THAT WHEREAS the parties of the first part made, executed and delivered to the parties of the second part a certain Indenture of Lease and Contract for the exclusive agency throughout the United States for the sale of Brooten's Kelp Ore, which indenture of lease and contract is dated the 21st day of February, 1925, and recorded in the County Clerk's office for the County of Tillamook, State of Oregon, on the 30th day of April, 1925 in Book of Deed Records Number 53 on page 145–7 thereof:

''AND WHEREAS the parties to said contract desire to enlarge the territory provided in said contract for covering the exclusive agency throughout the

United States of America to and including all territory in the world.

"AND WHEREAS, the parties of the second part desire to have the exclusive agency throughout all foreign territory;

"NOW THEREFORE IT IS HEREBY MUTUALLY AGREED and in consideration of one ($1.00) Dollar paid to the parties of the first part by the parties of the second part, said contract is hereby modified and changed in that the exclusive agency therein referred to covering only the United States of America be and shall include the entire world, thereby covering all foreign territory for the exclusive agency and sale of the Kelp Ore provided for in said contract, and said parties of the second part hereby agree to accept said modification of said contract so as to include such additional territory as herein provided with the express understanding and agreement that all the other terms, conditions and stipulations contained in the aforesaid contract shall remain in full force and effect and without any change or modification whatsoever, except only as to additional territory provided. Parties of the second part hereby agreed to purchase one thousand and two hundred ($1200.00) dollars worth of Brooten's Kelp Ore products per month."

This instrument was signed and sealed.

The complaint alleged the foregoing instrument, averred that the defendants' desire to obtain a market for Kelp Ore prompted them to sign it, that Tucker and Sullivan procured the cancellation of the former contract mentioned in the above instrument, caused the plaintiff corporation to be organized, assigned to it the contract, that the corporation performed "each and every obligation therein imposed upon it, and expended large sums of money in developing the sales agency and distribution of said Kelp Ore remedies, and expended large sums in properly advertising the

same and in creating agencies for the sale and distribution thereof throughout the Pacific Coast States and developed a large and extensive growing market for the sale of said Kelp Ore remedies, and built up a lucrative and paying and profitable business and did each and every thing imposed on it by the terms and conditions of said contract, and the extension thereof as made on the 13th day of January, 1926 * * '' The other averments in the complaint we need not mention. The defendant interposed a demurrer on the ground that the complaint does not state a cause of action; their principal contention was that the alleged contract is wanting in mutuality. The demurrer was sustained; plaintiff appealed.

Specifically the defendants contend that while the instrument undertakes to bind the defendants to sell Kelp Ore to the plaintiff at specific prices and in any quantities the latter may requisition, the plaintiff is not bound to do anything; they argue that the plaintiff has not undertaken to buy, order, advertise Kelp Ore, or create a market for it, and proceeding aver that if any semblance of an agreement upon the plaintiff's part may be discovered in the instrument, it is rendered ineffective by the clauses which expurgate the plaintiff's defaults and breaches by providing that upon such development the contract shall become null and void; they further point to the clause which provides that the contract shall ''continue so long * * as the parties of the second part fulfill and carry out the terms and conditions of this agreement.'' Next the defendants argue that the contract contains conditions precedent and that the complaint does not aver that the plaintiff, or its predecessors, discharged them. Finally the defendant maintains that under

the amendment of January 13, 1926, the contract expired January 13, 1927.

A reading of the instrument discloses that it is founded upon a "consideration of $1 and other valuable considerations paid to the parties of the first part by the parties of the second part, the receipt whereof is hereby acknowledged." In the event of an automatic termination of the contract through the default of the plaintiff there is no provision for a return of these valuables to the plaintiff. Further an examination of the instrument reveals that it bound the plaintiff absolutely to purchase $9,500 worth of Kelp Ore: $5,000 worth May 2, 1925, "and for a period of nine months following said 2nd day of May, 1925, said parties of the second part are to purchase not less than $500 per month." The clause which employs the words "null and void" does not affect this stipulation of the contract.

When the foregoing nine months' period had come to a close the defendants had received from the plaintiff (1) "a consideration of $1" (2) "other valuable considerations," (3) $9,500, (4) a promise to buy Kelp Ores in such increasing quantities that each subsequent year's purchases will exceed the preceding year's. Only the fourth item was affected by the above clause which contains the condition subsequent. At the time just mentioned the defendants had thus disposed themselves; (1) they had delivered $9,500 of their remedies to the plaintiff; (2) had agreed to supply plaintiff with Kelp Ore upon receipt of payment; (3) had agreed "this contract shall become null and void" if the plaintiff failed to purchase year by year the appropriate quantities: in other words they released the plaintiffs from damages for breach

of contract by inserting a provision for termination of the contract.

From the foregoing it is at once apparent that the plaintiff's predecessors gave to the defendants a consideration for the latter's promises. We cannot concern ourselves with the value of this *quid pro quo:* Williston on Contracts, § 115; 13 C. J., Contracts, § 237, p. 365; 6 R. C. L., Contracts, p. 678, § 85, and *Johnson* v. *Homestead-Iron Dyke Mines Co.*, 98 Or. 318 (193 Pac. 1036). It is to be observed that while the plaintiff's predecessors paid for the defendants' premises, the latter parted with nothing when they executed the instrument.

It may be appropriate at this point to observe that the record seems to warrant the conclusion that the defendants' Kelp Ore, which apparently was a medicinal substance found in natural deposits upon the defendants' land, possessed only a limited local market, and that a desire to secure an extensive market induced the defendants to execute this instrument. Common observation teaches one that the plaintiff could not discharge its task without the expenditure of money, skill and effort. In the event that the plaintiff's results failed to match the demands of the contract, and the defendants terminated the latter by authority of the provisions previously adverted to, the financial loss to the plaintiff would, in all likelihood, have been a serious one. Further, such a cancellation would have automatically rendered available to the defendants whatever market the plaintiff had established. These facts may explain why the defendants saw fit to release the plaintiff from the payment of damages in the event of plaintiff's breach of those terms of the contract which demanded an ever-increasing market; in addi-

tion it is to be noticed, that, since the plaintiffs were required to pay for all of the defendants' products upon receipt, the latter's damages in the event of a breach, might not have been extensive. Perhaps, they would have been fully defrayed by the consideration passing to the defendants upon execution of the contract.

■ ■ The problem now confronts us whether the document, so far as it afforded privileges to the plaintiff after the conclusion of the nine months' period of time, was a (1) *nudum pactum*, (2) a bilateral contract, or (3), an option. We are satisfied that the parties did not intend to enter into a nonenforceable engagement. The exaction of a valuable consideration from the plaintiff's assignor is enough to repel any such suggestion. Next, we believe that before the court would be authorized to hold that the instrument is a bilateral contract it must be prepared to point to words expressing an undertaking upon the plaintiff's part to purchase all of the defendants' Kelp Ore. The circumstances before us seem to justify the inference that when the parties entered into the agreement they were not informed of the quantity of Kelp Ore upon the premises, nor were they certain that the plaintiff could develop a market; hence, it would seem unreasonable to assume that the plaintiff bound itself to purchase all of the defendants' product at a stipulated price. We find in the writing a definite commitment to purchase $9,500 worth of Kelp Ore, but no enforceable undertaking to buy any more than that; hence, we discard the bilateral contract suggestion.

■ We believe, however, that the instrument is readily capable of construction as an option. The consideration, previously mentioned, constituted the

price plaintiff's assignor paid for that option. The privileges afforded to the plaintiff are to purchase Kelp Ore upon the terms stated in the writing. To protect the defendants against undue delay the contract requires the plaintiff to purchase a definite amount the first year and ever increasing amounts year by year thereafter under penalty of a termination of the contract in the event of a default in this particular.

In *Lemler* v. *Bord*, 80 Or. 224 (156 Pac. 427, 428), this court quoted from *Giles* v. *Bradley*, 2 Johns. Cas. (N. Y.) 253, as follows:

"There can be no doubt but that a contract may be so made as to be optional on one of the parties, and obligatory on the other, or obligatory at the election of one of them."

and then thus expressed itself:

"An 'option' is a unilateral obligation founded upon a valuable consideration paid or promised by a party for the right to express a choice which, when exercised consummates a binding agreement on the part of both parties."

And from Williston on Contracts, § 140 we quote:

" * * If the option goes so far as to render illusory the promise of the party given the option, there is indeed no valid consideration, and therefore no contract, but the mere fact that the option prevents the mutual promises from being coextensive does not prevent both promises from being binding according to their terms. A court of equity might indeed refuse to enforce specifically such a contract if it seemed oppressive, but to deny its legal validity is to contradict directly the numerous cases which hold adequacy of consideration is a matter exclusively for the decision of the parties. The large class of cases where one party to a contract may reject performance which is not satisfactory to him, or to his architect or en-

gineer, while no corresponding privilege is given to the other party, is itself enough to establish what should need no argument, that the obligations of the parties to a contract need not be correlative or coextensive.''

Hence, we conclude that the option theory is available, provided, that resort to it renders effective the intention of the parties as gleaned from the document. The application of that construction avoids concluding that these three instruments constitute only a *nudum pactum*. Likewise it presents the defendants a ready method of compelling the plaintiff to create a market by resorting to the condition subsequent; a forfeiture under the latter, rendering available to the defendants whatever market the plaintiffs had created. It seems to us that this construction is the one the parties intended. The argument that it is unlikely that the defendants, with a supply of Kelp Ore inexhaustible for one hundred years, would have been willing to bind themselves to continue to supply Kelp Ore to the plaintiff, which was free to cease purchases at any time, finds no support in any facts before this court: the record is silent as to the quantity defendants have available. We shall revert once more to the clause which employs the words ''null and void''; it is true that it is thus provided that the contract shall become ''null and void'' upon the plaintiff's failure to increase its purchases year by year. But, where such a provision is not inserted for the benefit of both contracting parties, ''void'' will be construed as ''voidable'' at the election of the favored party: Williston on Contracts, § 746. It seems clear that a privilege of terminating the contract for the plaintiff's default was not intended for the benefit of the vendee, because ordinarily one

is precluded from taking advantage of his own default. The entire plan of operation, as it appears from the record, satisfies us that the remedy of rescission was intended for the exclusive protection of the defendants. Nothing contained in *Potter Realty Co.* v. *Derby,* 75 Or. 563 (147 Pac. 548), is at variance with the above; in that case the contract provided that in the event of certain defaults "this contract shall be null and void as to both parties hereto without notice"; those words were definite and left no room for construction.

■ The paragraph, found near the conclusion of the contract, which provides that " * * this contract and agreement shall continue * * so long as the parties of the second part fulfill and carry out the terms and conditions of this agreement * * ," being in the nature of a general expression upon a subject concerning which the parties had already specifically spoken in the aforementioned condition subsequent clause, we believe is limited and confined by the latter. See Page on Contracts, § 2026.

Having adopted a construction of the contract which renders the undertaking for the purchase of $9,500 worth of Kelp Ore bilateral, and the provision for subsequent years as a stipulation for an option, we believe that the situation of these parties is similar to that disposed of in the case of *Johnson* v. *Homestead-Iron Dyke Mines Co.,* 98 Or. 318 (193 Pac. 1036). There the plaintiff bound himself to haul 1,600 tons of material at a stipulated price; upon the completion of that task the contract recited that the plaintiff should have "the preference right to continue hauling" other similar materials originating at the defendants' plant "as long as the company shall have any hauling to be done." This court, after point-

ing out the primary rules of construction which we need not repeat, held the quoted paragraph afforded the plaintiff an option to haul the latter materials. The decision pointed out:

"There was some consideration for the option. Plaintiff purchased a motor truck, quit his employment, went to Homestead, and in storms and over bad roads undertook to fulfill his contract by hauling the produce of defendant's mine from Homestead to Oxbow. He was induced to undergo the hardships of hauling the concentrates on hand at the beginning by the defendant's promise to give him the right to do all its hauling so long as it had hauling to do. That was the incentive that moved the contractor to enter into the contract."

Similarly in the case now before us, the inference seems to be permissible that the plaintiff made its original purchase of $9,500 worth of Kelp Ore, influenced in part by the expectation that through its resale a goodwill would be established which would result in profits upon later sales. If this inference is permissible a consideration is present similar to that in the case just reviewed. But if the inference is not permissible we nevertheless have a consideration of $1, and other valuable considerations to support the option. In a note to the case of *International Shoe Co.* v. *Herndon,* 135 S. C. 138 (133 S. E. 202, 45 A. L. R. 1192), the editor of that series states:

"In connection with a sale of goods, an option which has been given to the purchaser, of buying other goods, has frequently been held to be valid where it has not been supported by any new or independent consideration other than the actual purchase, the buyer having not expressly, nor even impliedly, agreed to take other goods; the courts taking the view

in such cases that the actual purchase of the initial order constituted of itself a good and sufficient consideration for the option to purchase the other goods.''

The defendants' brief contains a number of citations to decisions in which the court found that the agreement of the parties had not risen to the dignity of a contract. We deem it unnecessary to undertake to set forth our review of those numerous cases. In many the promisee was unable to point to anything which he exchanged for the promise which his action sought to enforce. In others his contract made provision for its termination upon a return of the consideration. We believe that the facts of our case are sufficiently dissimilar from those cases.

It follows from the foregoing that we conclude that the provisions of the contract covering the period following the nine months afforded the plaintiff an option terminable at the will of the defendants upon the plaintiff's default.

■ ■ The defendant contends that the provision requiring the purchase of $9,500 worth of Kelp Ore constituted a condition precedent to the duties subsequently provided for, and that since the complaint does not aver the discharge of those exactions it was vulnerable to the demurrer. A construction holding that a provision of a contract is a condition precedent is disfavored: Clark on Code Pleading, § 45. From Williston on Contracts, § 666a, we quote:

''A precedent condition in a contract is the typical kind. It must be performed or happen before liability arises on the promise which the condition qualifies. One may also speak of a condition precedent to the existence of a contract. Acceptance is such a condition, but when the question under consideration

is the construction of a contract or the duties arising under it, the term means a prerequisite to liability.''

We do not believe that the stipulation for the purchase of $5,000 of Kelp Ore May 2, 1925, and $4,500 in nine monthly installments thereafter was intended to negative liability upon the provisions of the contract which followed. It follows that we deem this contention is without merit.

■ Finally the defendants contend that the amendment of January 13, 1926, which extended the contract for one year, necessarily fixed its termination as January 13, 1927. Ordinarily extensions are granted when a contract is about to expire, or the favored party is in default. Even a hasty examination of the contract reveals that upon the former date the contract was not nearing its expiration. Upon the other hand it is apparent that if the vendees had begun performance, but a very small part of the contemplated purchases had been made. That circumstance, together with the fact that on March 13, 1926, the contract was again modified so as to extend the plaintiff's territory and increase the amount of its required monthly purchases would seem to warrant the inference that January 13, 1926, the vendees were in default, and that the extension of time was given for that reason. The amendment of March 13, 1926, which expressly preserved all of the covenants of the original contract, precludes any finding that the first amendment terminated the contract January 13, 1927.

We have carefully considered all of the arguments ably presented in defendants' brief, but are persuaded that the complaint states a cause of action.

REVERSED.

MCBRIDE, BEAN and RAND, JJ., concur.